NOVIN, J.T.C.
This letter constitutes the court’s opinion on defendant taxpayers’ motion to dismiss plaintiffs Complaints and plaintiffs cross-motion for partial summary judgment in the above-referenced consolidated matters.
For the 2014 tax year, the City of Elizabeth (“plaintiff’), increased the assessments on 212 Class 4C properties in the taxing district. Defendants, 264 First Street, LLC, et als. (“Taxpayers”), comprise the owners of 52 of the 212 Class 4C properties affected *416 by the increased assessments. Prior to increasing the 2014 tax year assessments on the 212 Class 4C properties, plaintiffs municipal tax assessor (the “Assessor”) did not notify in writing the mayor, municipal governing body, county board of taxation or county tax administrator of the need to reassess such properties, and did not submit, or obtain approval of, a compliance plan.
Under N.J.S.A. 54:4-23 a municipal tax assessor is annually required to “determine the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1 next preceding the date on which the assessor shall complete his assessments ...” The provisions of N.J.S.A. 54:4-23 were supplemented by L. 2001, c. 101 (“Chapter 101”), which authorized an assessor, if he or she “has reason to believe that property comprising all or part of a taxing district has been assessed at a value lower or higher than is consistent with the purposes of securing uniform taxable valuation of property according to law,” to “make a reassessment of the property in the taxing district that is not in substantial compliance.” The purpose and goal of Chapter 101, as expressed in the statutory language, was to secure “uniform taxable valuation of property according to law.” However, such grant of authority was conditioned on: (1) the assessor notifying, in writing, “the mayor, the municipal governing body, the Division of Taxation in the Department of the Treasury[1], the county board of taxation, and the county tax administrator of the basis of the assessor’s determination that a reassessment of that property in the taxing district is warranted”; and (2) the assessor submitting, for approval, a “compliance plan” to the county board of taxation and Division of Taxation[2]; and (3) following the “reassessment of a portion of the taxing district,” the *417 assessor is required to certify to the county board of taxation, in a manner deemed adequate by the board, that the reassessment was in compliance with that portion of the district which was not reassessed. N.J.S.A. 54:4-23.
Defendants move for summary judgment seeking to dismiss plaintiffs Complaints, thei’eby affirming the Union County Board of Taxation (the “Board”) judgments which invalidated the increased 2014 tax year assessments. Defendants maintain the Assessor’s actions violated the procedural safeguards enacted under Chapter 101 and therefore, the 2014 tax year assessments are void. Additionally, defendants contend the Assessor’s actions constitute impermissible spot assessments and violate the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment to the United States Constitution.
Plaintiff not only opposes defendants’ motion, but has submitted a cross-motion for partial summary judgment asking the court to set aside the Board judgments and reinstate the increased 2014 tax year assessments. In support of their motion, plaintiff maintains: (i) the 212 Class 4C properties were not located in the same neighborhood or geographical area of the taxing district and thus, do not constitute “part of’ or “a portion of’ the taxing district; and (ii) the assessor did not conduct a “reassessment” of property in the taxing district under Chapter 101. Instead, plaintiff asserts the assessment changes to the 212 Class 4C properties resulted from the practice of assessment maintenance, thereby alleviating the need to provide written notice to the mayor, municipal governing body, county board of taxation and county tax administrator, and to submit a compliance plan. Alternatively, plaintiff argues if the Assessor’s actions violated Chapter 101, the statutory scheme of the Tax Court is to hear and determine all issues of fact and law de novo. Consequently, because county board hearings and Tax Court proceedings are separate and distinct, plaintiff asserts that it should be permitted to pursue its affirmative claims of discrimination, under N.J.S.A. 54:51A-6, against defendants’ properties.
For the reasons that follow, the court concludes that: (1) the 212 Class 4C properties constitute a “part of a taxing district” and *418 “a portion of a taxing district,” as contemplated under Chapter 101; and (2) the Assessor’s actions amounted to a “reassessment of property in the taxing district”; and (3) the practice of assessment maintenance does not, in and of itself, trigger the prior written notice and compliance plan submission requirements under Chapter 101; and (4) although the Assessor violated Chapter 101, plaintiff may pursue its claims of discrimination against defendants; and (5) insufficient information has been presented to the court to determine whether the Assessor’s actions constitute impermissible spot assessments. Consequently, the court grants, in part, and denies, in part, defendants’ motion for summary judgment and denies plaintiffs cross-motion for partial summary judgment.
I. Procedural History and Findings of Fact
For the 2014 tax year, the Assessor increased the assessments on 212 properties in the City of Elizabeth. Each of the 212 properties are classified as Class 4C apartment complexes under N.J.A.C. 18:12-2.2(g). For the 2014 tax year, the City of Elizabeth’s 2014 tax roll included approximately 608 Class 4C apartment complexes. The defendants comprise the owners of 52 of the 212 Class 4C properties affected by the increased 2014 tax year assessments. The total assessments (including both land and improvements) for the 2013 and 2014 tax years, for each of the defendants 52 properties (the “subject properties”), were as follows:
*419 Defendant 2013 Assessment 2014 Assessment
264 First Street, LLC $ 69,300 $ 83,300
Point Properties 2003, LLC $ 185,000 $ 241,100
J & E Associates S 215,000 S 251,900
Melrose Court, LLC S 150,000 $ 183,200
557 S Broad, LLC S 101,000 S 118,000
Martha Bell Associates, LLC $ 225,500 $ 277,400
Cherry Pines Assoc CIO Reibel $ 245,000 S 316,200
Cherry' Pines Assoc CIO Reibel $ 175,500 S 213,800
Cherry' Pines Assoc CIO Adam Reibel $ 175,000 S 213,800
Clinton House Associates, LLC $ 460,100 $ 582,200
Twenty Elm Associates S 340,100 $ 394,100
Martha Bell Associates, LLC $ 155,000 $ 216,500
Cherry Pines Assn CIO A Reibel S 107,100 S 126,500
Helena Fidziukiewicz, LLC S 131,000 $ 161,500
Reibel, Joseph & Lisa S 206,000 $ 284,900
1116 Anna Holdings. LLC $ 234,900 $ 281.700
150-152 De Hart Place Corp $ 92,600 S 106.900
A & T Realty, LLC $ 200,000 $ 242.800
A & T Realty, LLC $ 220,000 S 266.500
Point Properties 2003, LLC $ 250,000 S 354.000
Meadow Builders Joint Venture S 240,000 S 292,300
Centanni, Joseph $ 154,600 S 204.700
Reibel, L & Reibel, M B & Kushn S 180,000 $ 216.100
1116-1120 Anna Realty, LLC $ 378,500 S 460.000
Data Properties. LLC $ 750,000 $ 885,500
600-638 North Broad St, LLC $ 590,000 S 710,700
Wilder Manor Associates $ 340,000 $ 441,400
Hochberger Realty Corp S 850,000 SI,181.800
Hung 2004, LLC $ 364,500 $ 460.400
Hung 2004, LLC $ 310,500 $ 444,700
1259 Waverly Place 2001, LLC ET $ 187,500 $ 221.000
1259 Waverly Place 2001, LLC ET $ 187,500 S 221,000
1259 Waverly Place 2001, LLC ET S 264,300 S 305.400
Point Properties 2003, LLC $ 200,000 $ 222,100
535 Westminster Ave, LLC $ 250,800 S 284,800
Monroe Gardens, LLC $ 170,000 S 190.900
1141-1147 Hand PI, LLC $ 300,000 S 353.300
Kings Manor Joint Venture $ 386,200 S 472,600
J P Gifford, LLC % J P MNGMNT $ 116,000 S 137.400
Monroe Gardens, LLC $ 260,000 S 305,400
DeHart Place Holdings, LLC S 458,100 S 504,500
Bayway Gardens, LLC $ 100,000 S 122,100
Lidgerwood Manor Associates $ 223,700 $ 300,900
Centanni, Joseph $ 28,000 $ 42.000
Centanni, Joseph S 165,000 S 199,900
Centanni, Joseph $ 100,000 S 133.200
Kushner, Joseph & Others $ 258,000 $ 329,000
Canton Properties 2003, LLC NJ S 188,000 $ 230.000
Meadow Builders Joint Venture S 155,000 $ 204.700
Centanni, Joseph $ 165,000 $ 201,300
Gawel, Cezary & Lucia S 103,800 S 124.900
Imbomone, Sal $ 30.800 $ 42,000
*420 The average ratio of assessed to true value, commonly referred to as the Chapter 123 ratio, for the City of Elizabeth for the 2014 tax year is 13.88%. See N.J.S.A. 54:1-35a(a).
Defendants filed 52 petitions of appeal with the Board challenging the increased 2014 tax year assessments. Defendants’ counsel moved before the Board to void the increased 2014 tax year assessments and reinstate the 2013 tax year assessments, raising substantially the same arguments presented herein. Plaintiffs counsel opposed the motion and raised substantially the same arguments presented herein.[3] On May 30, 2014, the Board entered judgments voiding the increased 2014 tax year assessments and reinstated the 2013 tax year assessments on the subject properties. Each Memorandum of Judgment contained the notation “Failure to file Compliance Plan” in its explanation for entry of the judgment. The Memorandums of Judgment were mailed by the Board on June 5, 2014.
On July 18, 2014, plaintiff filed Complaints with the Tax Court against defendants appealing the judgments of the Board alleging the subject properties were assessed below true market value and the assessments were discriminatory under N.J.S.A. 54:51A-6. On August 1, 2014, defendants filed Answers and Counterclaims alleging the increased 2014 tax year assessments were discriminatory and the subject properties were assessed in excess of them true market value.
The court concluded common questions of law arose with respect to the above-captioned matters and, on October 16, 2014, granted defendants’ motion to consolidate the 52 matters under R. 8:8-3(a).
Thereafter, defendants moved before the court, under R. 1:6— 3(a), to dismiss plaintiffs Complaints. The court notified counsel that defendants’ motion constituted a motion for summary judgment and thus, R. 4:46-1 would govern the disposition. In response, plaintiff submitted a cross-motion for partial summary judgment.
*421 Defendants argue they are entitled to the relief sought, as a matter of law, because the Assessor did not adhere to the procedural requirements under Chapter 101 before increasing the 2014 tax year assessments on the subject properties. Defendants contend the phrases “part of a taxing district” and “a portion of the taxing district” refer to the change of more than a single property’s assessment. Thus, changes to more than one property assessment in a tax year (except for changes permitted for added, omitted or added/omitted assessments, correction of mathematical errors, exemptions, demolitions, or changes required by tax appeal judgments) would trigger an assessor’s obligation to provide written notice to the mayor, municipal governing body, county board of taxation and county tax administrator, and to submit, and obtain approval of, a compliance plan. Alternatively, defendants argue the 212 Class 4C properties constitute more than one-third of all Class 4C properties in the taxing district. Hence, defendants assert the scope of the particular class of properties affected here was intended by the Legislature to constitute “part of a taxing district” and “a portion of the taxing district” under Chapter 101.
In sum, defendants raise five arguments to the court: (1) the Assessor failed to notify, in writing, the mayor, the municipal governing body, the county board of taxation, and the county tax administrator that a reassessment of the subject properties was warranted, in violation of Chapter 101; and (2) the Assessor failed to submit, and obtain approval of, a compliance plan, in violation of Chapter 101; and (3) following reassessment of the subject properties, the Assessor failed to certify to the Board, that the reassessment was in substantial compliance with the portions of the taxing district that were not reassessed, in violation of Chapter 101; and (4) the Assessor’s actions constituted spot assessments, violating the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, § 1; and (5) the Assessor denied defendants adequate notice and an opportunity for a fair hearing, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, § l.[4]
*422 In opposition to defendants’ motion, and in support of its cross-motion for partial summary judgment, plaintiff argues submission of a compliance plan was not a condition precedent to the Assessor increasing the 2014 tax year assessments on the subject properties. Plaintiffs counsel candidly admits the Assessor increased the 2014 tax year assessments on the subject properties without adhering to the procedural requirements enacted under Chapter 101. However, plaintiff argues “part of a taxing district” and “a portion of a taxing district” were intended to denote only neighborhoods or select geographical areas of a taxing district. Consequently, because the 212 Class 4C properties were “scattered throughout” the taxing district, the Assessor was relieved from adhering to the procedural requirements under Chapter 101. Plaintiff also advances the argument the Assessor “did not determine that reassessment was necessary” and therefore, “did not conduct a reassessment” of part of a taxing district as contemplated under N.J.S.A. 54:4-23. Plaintiff asserts the increased 2014 tax year assessments were the result of the assessor’s “assessment maintenance” practice. Hence, plaintiff reasons that because Chapter 101 supplemented, but did not amend N.J.S.A. 54:4-23, no prior written notice to the mayor, governing body of the municipality, county board of taxation and county tax administrator, and submission of a compliance plan was required. Stated differently, plaintiff posits that when assessment maintenance results in increased assessments on property not located in one neighborhood or geographical area of the taxing district, an assessor is relieved from the notice and procedural requirements under Chapter 101. Alternatively, plaintiffs counsel asserts if the Assessor’s actions violated the procedural requirements under Chapter 101, the statutory scheme of the Tax Court is to hear and determine all issues of fact and law de novo. Consequently, because county board hearings and Tax Court proceedings are separate and distinct, plaintiff argues that it should be permitted *423 to pursue its affirmative claims of discrimination against defendants’ properties.
II. Conclusions of Law

A. Summary Judgment

Summary judgment should be granted where “the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the [moving] party is entitled to a judgment or order as a matter of law.” Alpha I, Inc. v. Director, Division of Taxation, 19 N.J.Tax 53, 56 (Tax 2000)(citing R. 4:46-2).
In Brill v. Guardian Life Insurance Co. of America, 142 N.J. 520, 536, 666 A.2d 146 (1995)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), our Supreme Court adopted the federal approach to resolving motions for summary judgment, in which “the essence of the inquiry [is] whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.” In conducting this inquiry, the trial court must engage in a “kind of weighing that involves a type of evaluation, analysis and sifting of evidential materials.” Id. at 536, 666 A.2d 146. The standard established by our Supreme Court in Brill is as follows:
[W]hen deciding a motion for summary judgment under R. 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential material presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational fact finder to resolve the alleged disputed issue in favor of the non-moving party.
In considering all of the material evidence before it with which to determine if there is any genuine issue of material fact, the court must view most favorably those items presented to it by the party opposing the motion and all doubts are to be resolved against the movant. Ruvolo v. American Cas Co., 39 N.J. 490, 491, 189 A.2d 204 (1963). It is the burden of the moving party “to *424 exclude any reasonable doubt as to the existence of any genuine issue of material fact” with respect to the claims being asserted. United Advertising Corp. v. Metuchen, 35 N.J. 193, 196, 172 A.2d 429 (1961). “By its plain language, R. 4:46-2 dictates that a court should deny a summary judgment motion only where a party opposing the motion has come forward with evidence that creates a ‘genuine issue as to any material fact challenged.’ ” Brill, supra, 142 N.J. at 529, 666 A.2d 146. However, if the party opposing the summary judgment motion merely presents “facts which are immaterial or of an insubstantial nature, a mere scintilla, fanciful, frivolous, gauzy or merely suspicious,” then an otherwise meritorious application for summary judgment should not be defeated. Judson v. Peoples Bank and Trust Co., 17 N.J. 67, 75, 110 A.2d 24 (1954). Hence, “when the evidence is so one-sided that one party must prevail as a matter of law ... the trial court should not hesitate to grant summary judgment.” Brill v. Guardian Life Insurance Co. of America, supra, at 540, 666 A.2d 146 (quoting Anderson v. Liberty Lobby, Inc., supra, 477 U.S. at 252, 106 S.Ct. 2505).
In applying these standards to the instant motions, the court concludes that there are no genuine issues of material fact in dispute with respect to the relief being sought on the issues of statutory interpretation and alleged violations of Chapter 101 and therefore, those matters are ripe for summary judgment. However, the court determines that at this time an insufficient record exists to enable the court to conclude that no genuine issues of material fact are in dispute pertaining to the allegations of unconstitutional spot assessment and violations of the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment to the United States Constitution. Therefore, on those issues, this matter is not ripe for summary judgment.
B. N.J.S.A. 54.4-23/Chapter 101
The authority to impose a tax on real property is governed by Article VIII, Section 1, Paragraph 1(a) of the New Jersey Constitution, commonly referred to as the Uniformity Clause. The Uniformity Clause provides that all real property in a taxing *425 district shall be assessed under uniform rules and according to the same standard of value. N.J. Const. art. VIII, § 1, para. 1(a). That fundamental tenet has been a construct of the New Jersey Constitution since 1844. N.J. State League of Municipalities v. Kimmelman, 105 N.J. 422, 428, 522 A.2d 430 (1987)(citing New Jersey Constitution of 1844, art. IV, § 7, para. 12 (as amended in 1875)). Our Supreme Court has long recognized the constitutional right of taxpayers to “equality of treatment in sharing the duty to pay real estate taxes.” Township of West Milford v. Van Decker, 120 N.J. 354, 360-361, 576 A.2d 881 (1990) (quoting Murnick v. City of Asbury Park, 95 N.J. 452, 458, 471 A.2d 1196 (1984)). This “dominant principle” is intended to ensure not only an equality of treatment, but a corresponding sharing of the burden in property assessments. Regent Care Center, Inc. v. City of Hackensack, 362 N.J.Super. 403, 415, 828 A.2d 332 (App.Div.2003)(quoting Baldwin Construction Co. v. Essex County Bd. of Taxation, 16 N.J. 329, 340, 108 A.2d 598 (1954)). Our system mandates that a taxpayer be conferred “ ‘treatment commensurate with that given his fellow taxpayers within the municipality’ and that if it is not accorded [such treatment], he is entitled to a judicial or quasi-judicial remedy.” Tri-Terminal Corp. v. Borough of Edgewater, 68 N.J. 405, 409, 346 A.2d 396 (1975)(quoting In re Appeals of Kents 2124 Atlantic Ave., Inc., 34 N.J. 21, 25, 166 A.2d 763 (1961)). The “means best designed to meet” the directives of the Uniformity Clause would necessitate district-wide revaluations or reassessments each and every year; however, such an approach is “simply not feasible.” Regent Care Center, Inc., supra, 362 N.J.Super. at 415, 828 A.2d 332 (citing Bergen County Bd. of Taxation v. Borough of Bogota, 104 N.J.Super. 499, 507, 250 A.2d 440 (Law Div.1969), aff'd. o.b., 114 N.J.Super. 140, 275 A.2d 158 (App.Div.1971)).
It is against this backdrop that municipal tax assessors are charged with the responsibility to determine the full and fair value of each parcel of real property in the taxing district at such price as, in his or her judgment, it would sell for at a fair and bona fide sale on October 1 next preceding the date on which the assessor shall complete his or her assessments. N.J.S.A. 54:4-23. As *426 initially enacted, N.J.S.A. 54:4-23 was intended to implement the directives of the Uniformity Clause, by ensuring all real property in a taxing district was uniformly assessed. Office of Legislative Services Background Report, The Uniformity Clause and Real Property Assessment, January 10, 2000. It was out of this statutory scheme the practice of assessment maintenance was borne. Although the term assessment maintenance is not statutorily defined, the practice involves an assessor’s annual review of the district’s tax roll, at which time the “assessor changes some assessments in a year when district-wide revaluation or reassessment is not performed.” Regent Care Center, Inc., supra, 362 N.J.Super. at 411-412, 828 A.2d 332. Our Supreme Court has acknowledged the critical role assessment maintenance plays in ensuring each parcel of real property in a taxing district is assessed according to the same standard of value, consistent with other similarly situated taxpayers. Although “practicalities obviously preclude most assessors reviewing every assessment line item every year, there should nevertheless be alertness to changed valuation factors peculiarly affecting individual properties ... requiring prompt revision of such assessments ...” TriTerminal Corp., supra, 68 N.J. at 413-14, 346 A.2d 396. In performing their duties, assessors must promptly address assessment changes to “individual properties”, because a system which promotes “carrying over of assessments each year ... is not the proper discharge of the assessor’s function.” Ibid.
In 2001, the provisions of N.J.S.A. 54:4-23 were supplemented by Chapter 101. As supplemented, N.J.S.A. 54:4-23 provides:
AH real property shall be assessed to the person owning the same on October 1 in each year. The assessor shall ascertain the names of the owners of all real property situate in his taxing district, and after examination and inquiry, determine the full and fan- value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1 next preceding the date on which the assessor shall complete his assessments, as hereinafter required; ... provided further however, that when the assessor has reason to believe that property comprising all or part of a taxing district has been assessed at a value lower or higher than is consistent with the purpose of securing uniform taxable valuation of property according to law for the purpose of taxation, or that the assessment of property comprising all or part of a taxing district is not in substantial compliance with the law and that the interests of the public will be promoted by a reassessment of such property, the *427 assessor shall, after due investigation, make a reassessment of the property in the taxing district that is not in substantial compliance, provided that (1) the assessor has first notified, in writing, the mayor, the municipal governing body, [the Division of Taxation in the Department of the Treasury,] [5] the county board of taxation, and the county tax administrator of the basis of the assessor’s determination that a reassessment of that property in the taxing district is warranted and (2) the assessor has submitted a copy of a compliance plan to the county board of taxation [and to the Division of Taxation for approval] [6] ... Following a reassessment of a portion of the taxing district pursuant to the provisions of this section, the assessor shall certify to the county board of taxation, through such sampling as the county board of taxation deems adequate, that the reassessment is in substantial compliance with the portions of the taxing district that were not reassessed ...
In enacting Chapter 101, the Legislature required assessors to annually engage in a three-step process of property valuation. The first step requires the assessor to “after examination and inquiry, determine the full and fair value of each parcel of real property situate in the taxing district at such price” as it would sell for as of October 1st preceding the year of the assessment. N.J.S.A. 54:4-23. However, once such determination is reached, the assessor’s obligations are not concluded. The second sentence of N.J.S.A. 54:4-23 consists of three sentences, separated by two semicolons. Application of proper rules of grammar dictates that the use of a semicolon should be at the end of an enumeration, in separate sentences, that are related in thought. Stated differently, “a semicolon in an antecedent phrase is commonly interpreted to separate that phrase from a subsequent modifying phrase.” Morella v. Grand Union/New Jersey Self-Insurers Guar. Ass’n, 391 N.J.Super. 231, 241, 917 A.2d 826 (App.Div.2007)(citing Van Wart v. Gregory’s Garage, 6 N.J. Misc. 838, 840 (1928)). Thus, the Legislature’s use of two semicolons in the second sentence of N.J.S.A. 54:4-23 requires the subsequent phrases be read to modify the antecedent phrases. Accordingly, following an assessor’s determination of the full and fair value of each parcel of real property in the district, the second modifying step requires an assessor to ascertain: (i) if all or part of property *428 in the taxing district is being assessed at a value that is inconsistent with uniform standards of property tax valuation, or (ii) if the assessment of property comprising all or part of a taxing district is not in substantial compliance with the law, will the public interests be promoted by a reassessment of that property. If, in the second step, the assessor has answered either inquiry affirmatively, then Chapter 101 requires an assessor make a “reassessment” of the property in the taxing district not in compliance with the law by following the procedures set forth in the third step. The third step requires an assessor to first notify, in writing, the mayor, the municipal governing body, county board of taxation and county tax administrator of the need to make a reassessment of such property and to submit a compliance plan to the county board of taxation for approval. Following the reassessment, an assessor must certify to the county board of taxation that the reassessment performed was in substantial compliance with those portions of the taxing district that were not reassessed.
The arguments advanced by plaintiff and defendants involve differing interpretations of N.J.S.A. 54:4-23. Accordingly, the court’s analysis begins with an examination of the statutory language.
1. What is “part of’ and “a portion of’ under Chapter 101?
The rules of statutory construction require [5] that “[i]f the plain language of a statute creates uncertainties or ambiguities, a reviewing court must examine the legislative intent underlying the statute and ‘construe the statute in a way that will best effectuate that intent.’ ” Musikoff v. Jay Parrino’s the Mint, L.L.C., 172 N.J. 133, 136, 796 A.2d 866 (2002)(quoting New Jersey State League of Municipalities v. Department of Cmty. Affairs, 158 N.J. 211, 224, 729 A.2d 21 (1999)). Of paramount import for a court is to effectuate “the ‘fundamental purpose for which the legislation was enacted.’ ” Township of Pennsauken v. Schad, 160 N.J. 156, 170, 733 A.2d 1159 (1999). “[T]he best approach to [ascertain] the meaning of a tax statute is to give to the words used by the Legislature ‘their generally accepted meaning, unless another or different meaning is expressly indicated.’” Public Service Electric & Gas Co. v. Township of Woodbridge, 73 N.J. *429 474, 478, 375 A.2d 1165 (1977)(quoting New Jersey Power & Light Co. v. Township of Denville, 80 N.J.Super. 435, 440, 194 A.2d 16 (App.Div.1963)). If, based upon a plain reading, the statutory language is “clear and unambiguous,” the court must “implement the statute as written without resort to judicial interpretation, rules of construction, or extrinsic matters.” Bergen Commercial Bank v. Sisler, 157 N.J. 188, 202, 723 A.2d 944 (1999)(quoting In re Estate of Post, 282 N.J.Super. 59, 72, 659 A.2d 500 (App.Div.1995)). Conversely, if the “statute’s meaning is not self-evident” and is vulnerable to “varying interpretations,” the court may consider extrinsic factors to ascertain the Legislature’s intent. Id. at 202, 723 A.2d 944. An examination of N.J.S.A. 54:4-23 reveals no definition for the phrases “part of’ and “a portion of,” therefore an investigation of decisional authority and extrinsic evidence is warranted.
The only reported opinion to squarely address application of the phrases “part of’ and “a portion of’ is BASF Corp. Coating and Ink Div. v. Town of Belvidere, 22 N.J.Tax 550 (Tax 2005), aff'd, 24 N.J.Tax 416 (App.Div.2009). However, unlike the facts in the instant matter, in BASF Corp. Coating and Ink Div. the court was faced with the task of determining whether an assessor was required to possess an approved compliance plan prior to altering a single property’s tax assessment. Recognizing that Chapter 101 did not define the terms “part of’ and “a portion of’, the court aptly turned to an examination of the legislative history of Chapter 101 to attempt to glean the Legislature’s intent. See Township of Pennsauken v. Schad, supra, 160 N.J. at 170, 733 A.2d 1159 (concluding that, when statutory language is indistinct, a court may consider “extrinsic factors, such as the statute’s purposes, legislative history, and statutory context to ascertain the legislature’s intent.”)
After thoroughly analyzing the legislative history, Judge Kuskin concluded it provided no guidance in deducing the definitions of the terms “part of’ and “a portion of,” and turned to an examination of the regulations promulgated by the Director of the Division of Taxation in response to the enactment of Chapter 101. See Koch v. Director, Division of Taxation, 157 N.J. 1, 722 A.2d 918 *430 (1999) (concluding that, although courts are the final authorities on issues of statutory interpretation, they “generally defer to the interpretation that an agency gives to a statute that agency is charged with enforcing”). There the court found “[u]seful guidance as to the meaning of ‘part’ and ‘portion’ as used in Chapter 101.” BASF Corp. Coating and Ink Div., supra, 22 N.J.Tax at 559. The court observed that N.J.A.C. 18:12A-1.14(i) referred to the term ‘assessments’ in the plural, and not in the singular. This provided some insight to the court that the Legislature did not intend to compel an assessor to make application for a compliance plan when a single property’s assessment is at issue. The court next examined the criteria to be utilized by county boards of taxation in evaluating a proposed compliance plan. N.J.A.C. 18:12A-1.14(i)(3). The court viewed those regulations as “requiring a compliance plan only for changes to assessments in a ‘neighborhood’ or ‘area’ of a municipality ... thereby implying that a ‘part’ of a municipality comprises more than a single property.” BASF Corp. Coating and Ink Div., supra, 22 N.J.Tax at 560. Hence, the court reasoned “[the] statutory scheme relating to the assessment process ... does not apply to a change in a single assessment.” Id. at 564. The court ultimately concluded Chapter 101 does not mandate submission of “a compliance plan for a change in the assessment on a single property in a municipality.” Id. at 563.
Defendants argue that BASF Corp. Coating and Ink Div., supra, denotes that an assessor is only relieved from complying with the notice and procedural requirements under Chapter 101 when assessment maintenance affects change to a single property assessment. Thus, defendants reason that because the Assessor’s assessment maintenance plan affected 212 properties in the taxing district, Chapter 101 required the Assessor to provide written notice to the mayor, municipal governing body, county board of taxation and county tax administrator, and submit, and obtain approval of, a compliance plan, before increasing the 2014 tax year assessments on the subject properties.
Conversely, plaintiff argues BASF Corp. Coating and Ink Div., supra, espouses the view that increases in property tax assess *431 ments resulting from assessment maintenance do not require prior notice to the mayor, municipal governing body and county board of taxation, nor submission of a compliance plan, unless the properties are located in the same neighborhood or geographical area of the taxing district.
In affirming Judge Kuskin’s opinion, the Appellate Division observed that “adjusting an assessment for legitimate reasons is an appropriate exercise of the assessor’s statutory obligation and is not arbitrary or discriminatory.” BASF Corp. Coating and Ink Div. v. Town of Belvidere, 24 N.J.Tax 416, 419 (App.Div.2009)(citing Regent Care Center, Inc., supra, at 403, 828 A.2d 332). Thus, the Appellate Division concluded that:
[i]n the absence of a clear indication of a legislative intent to require a municipality to submit a compliance plan to the Division of Taxation and county board of taxation any time it undertakes to reassess an individual property, in order to discharge its responsibility for assessment maintenance, we are unwilling to read Chapter 101 to impose a burden upon municipalities to submit such plans or upon the Division of Taxation and county boards of taxation to review them.
[Id. at 420.]
Recognizing the immense burden which review and approval of a compliance plan places on the resources of municipalities and county boards of taxation, the Appellate Division was unwilling to impose such an obligation when only a single property’s assessment was at issue. The Appellate Division’s use of circumscribed phrases such as “adjusting an assessment for legitimate reasons” and undertaking “to reassess an individual property” addresses municipal action in the context of a single property’s assessment. The opinion does not discuss municipal action resulting in changes to multiple property assessments. Hence, this court views the Appellate Division’s opinion as relieving municipalities and county boards of taxation from the burden of reviewing compliance plans in cases affecting changes to only a single or a limited number of property assessments in a taxing district.
Additional support for the court’s conclusion that a compliance plan is not mandated when property assessment changes affect only a single or limited number of parcels of real property is found in Regent Care Center, Inc., supra. There, in analyzing whether assessment maintenance constituted impermissible spot assessing, *432 the court described the practice of assessment maintenance as affecting “some [property] assessments in a year when a district-wide revaluation or reassessment is not performed.” Id. at 411-12, 346 A.2d 396. The court observed that “adjusting an assessment for legitimate reasons is an appropriate exercise of the assessor’s statutory obligation and is not arbitrary or discriminatory. This is the appropriate mechanism by which the assessor keeps the tax rolls current when individual properties, based upon particularized, legitimate reasons, require adjustment.” The Appellate Division’s use of language “adjusting an assessment”, “some assessments” and “individual properties” connotes an assessment maintenance practice which affects only a limited number of individual properties, based on exacting criteria, thereby obviating submission of a compliance plan.
Thus, the court does not join defendants in their contention that an assessor must possess an approved compliance plan when assessment maintenance results in more than a single property’s assessment being altered. In the court’s opinion, such an expansive interpretation is contrary to the views expressed by the Appellate Division in BASF Corp. Coating and Ink Div. and Regent Care Center, Inc. that municipal action involving changes which affect “some assessments” do not require submission of a compliance plan.
The court is also unwilling to adopt plaintiffs interpretation of BASF Corp. Coating and Ink Div., supra. To narrowly construe and limit an assessor’s adherence to the procedural requirements mandated under Chapter 101 only when property tax assessment changes affect a well-defined neighborhood or geographical area could lead to the use of dubious tactics and gamesmanship in the revision of property assessments. In addressing the issue of probable legislative intent as a matter of legislative interpretation, our Supreme Court has stated:
When all is said and done, the matter of statutory construction here will not justly turn on literalisms, technisms [sic] or the so-called formal rules of interpretation; it will justly turn on the breadth of the objectives of the legislation and the common sense of the situation.
*433 [J.C. Chap. Prop. Owner’s, etc., Assoc. v. City Council, 55 N.J. 86, 100, 259 A.2d 698 (1969).]
In enacting Chapter 101, the Legislature empowered assessors with the authority to reassess property in a taxing district assessed in a manner inconsistent with establishing uniform taxable valuation, or to modify assessments not in substantial compliance with the law, provided that public interests would be promoted by such reassessment. Moreover, the objectives of assessment maintenance practices are aligned with the principles of the Uniformity Clause, by permitting assessors to make “changes [to] some assessments in a year when a district-wide revaluation or reassessment is not performed.” Regent Care Center, Inc., supra, 362 N.J.Super. at 412, 828 A.2d 332. Therefore, adopting a common sense approach to the objectives sought to be attained by Chapter 101, the court concludes the terms ‘part of and ‘a portion of were intended by the Legislature to encompass submission of a compliance plan for changes to assessments affecting a specific neighborhood or geographical area of a taxing district, or which affect a substantia] number of properties in the taxing district bearing the same property classification.
In reaching this conclusion, the court has examined and relies upon the decisional authority of BASF Corp. Coating and Ink Div., supra, and Regent Care Center, Inc., supra, including the extrinsic evidence recited therein, to root out the goals and objectives of the Legislature.
The court finds useful guidance of the Legislature’s intention in the Assembly Local Government Committee’s statement to Assembly Bill No. 2947 (the bill which when enacted, became Chapter 101). The committee statement set out to “clarify” the proposed legislation by permitting a tax assessor to “reassess just those parts of the taxing district that are not in substantial compliance with the rest of the taxing district.” Assembly Local Government Committee’s Statement to Assembly Bill No. 2947 with committee amendments (adopted January 18, 2001). The court views this statement as a reflection of the Legislature’s intent to accord assessors with the authority to reassess or adjust assessments on those properties in the taxing district which are *434 not in substantial compliance with the law; and to leave undisturbed those property assessments in the taxing district which are uniformly taxed. However, when undertaking the reassessment of “those parts of the taxing district”, the assessor must nevertheless be mindful of his or her obligation to notify the mayor, municipal governing body, county board of taxation and county tax administrator of the need to reassess such property, and submit a compliance plan for approval.
The court also finds valuable insight into the goals and objectives of the Legislature in the views articulated by the Director in the request for public comments to N.J.A.C. 18:12A-1.14(i). There the Director stated that “compliance plans are only done if and when an assessor proposes to revise and update existing assessments.” 35 N.J.R. 4850(a). The Director observed the statutory provisions under Chapter 101 will “continue the public policy of seeking uniformity” in taxation and “will have the beneficial effect of creating relative tax fairness, both in substance as well as perception.” 35 N.J.R. 4850(a). The Director further expressed the view that:
An assessor proposing to revise and update assessments because he or she has reason to believe that the property has been assessed at a value lower or higher than is consistent with the purpose of securing uniform taxable valuation of property according to law or is not in substantial compliance with the law and that the interests of the public will be promoted by reassessment of such property, is required to make a reassessment of the property not in substantial compliance to implement recent amendments to N.J.S.A. 54:4-23 (P.L. 2001, c. 101, § 1). In such a situation, the assessor must first send a written notification to municipal officials, and State and county tax, explaining the basis for the need for a reassessment, and submit a compliance plan by November 1 of the pretax year with all supporting documents sent to the county board of taxation and to the Division of Taxation. [35 N.J.R. 4850(a).]
This view does not accord with plaintiffs position that compliance plans are required only for district-wide reassessments and changes in tax assessments affecting a particular neighborhood or geographical area of a taxing district. The Director’s comments refer to the reassessment of property in a taxing district not in substantial compliance with the law, not property located in only a defined neighborhood or geographical area of a taxing district, or when a taxing district undergoing a municipal-wide reassessment. *435 Moreover, the Director envisioned Chapter 101 would give rise to a process of updating “assessments” throughout the municipality, and did not dictate that those properties be situate in neighborhoods or specific geographical areas. As expressed by the Director, the objective to be achieved by Chapter 101 is tax fairness, the treatment of similarly situated taxpayers in a consistent matter, and to secure uniform taxable valuation of property according to law.
The court further observes N.J.A.C. 18:12A-1.14(i)(3) identifies ten criteria to be considered by a county board of taxation in determining whether to approve a compliance plan. The sixth criteria provides that “[n]o more than 25 percent of the total number of line items can be changed except in extraordinary circumstances.” N.J.A.C. 18:12A-1.14(i)(3)(vi). The court draws the logical conclusion from this criteria that, when a proposed compliance plan seeks modification of more than 25% of the total line items in the district’s tax roll, a municipal-wide reassessment or revaluation is a more appropriate mechanism to achieve a uniformity of taxable valuation, then does a piecemeal reassessment of some property in the taxing district.
Here, as early as 2012, the Assessor acknowledged having observed that a “substantial portion” of the Class 4C properties in the taxing district “were selling for a price” that rendered the ratio of true to assessed value below the “lower limit.” Certification of Enrico Emma, January 20, 2015, para. 3. Despite observing this trend between 2012 and 2013, the record contains no evidence the Assessor notified the mayor, municipal governing body or county board of taxation of the variation between sales price and ratio of assessed to true value of such property in the taxing district. Instead, the Assessor directed the “computer department” to provide him “with a print out of every 4c property in the City showing the assessment, the equalized assessment^] the number of units and the equalized assessment per unit.” Certification of Enrico Emma, January 20, 2015, para. 5. That computer print out details each Class 4C property in the taxing district and includes each property’s block and lot, street address, property classification, number of residential dwelling units, date of last *436 sale, 2013 tax year assessment, the 2014 equalized upper limit value of the common level range, the 2014 equalized average ratio of assessed to true value and the revised 2014 assessment.
Plaintiff maintains the increased 2014 tax year assessments affected only 212 of the approximately 19,533 line items on plaintiffs tax roll. This amount, plaintiff argues, was de minimus and below the 25% threshold established under N.J.A.C. 18:12A-1.14(i)(3)(vi). However, a closer examination of the schedule prepared at the direction of the Assessor reveals that of the 19,533 line items comprising plaintiffs tax roll, only 608 properties were designated as Class 4C apartment complexes under N.J.A.C. 18:12-2.2(g). Thus, here the Assessor identified a particular class of property in the taxing district, the Class 4C properties, scrutinized the assessments of all properties in the class and adjusted the assessments of 212 properties within that class based upon an “income capitalization approach to value” that he developed. The court views N.J.S.A. 54:4-23 as an application of the Uniformity Clause, requiring treatment of all taxpayers in a taxing district in a manner consistent with other similarly-situated taxpayers. See Van Decker, supra, at 361, 576 A.2d 881. Hence, absent outside or extrinsic factors affecting a property’s assessment, property located in a neighborhood or geographical area of a taxing district, or property bearing an analogous property classification, under N.J.A.C. 18:12-2.2(g), must be assessed in a consistent and uniform manner. Hence, the court measures the procedural requirements under Chapter 101 against that standard. When the 212 Class 4C properties affected by the increased assessments are viewed against the 608 Class 4C properties in the taxing district, the 212 properties comprise approximately 35% of the properties in that property class. Thus, the increased 2014 tax year assessments levied by the Assessor against the subject properties exceeded the maximum percentage of line items for properties of that class, which is an element to be considered in implementation and approval of a compliance plan under N.J.A.C. 18:12A-1.14(i)(3)(vi).
As expressed by the Director, Chapter 101 will “continue the public policy of seeking uniformity in the way revaluations and *437 reassessments of real property valuations are done. This will have the beneficial effect of creating relative tax fairness, both in substance as well as perception.” 35 N.J.R. 4850(a). This expression mirrors the principles of the Uniformity Clause, namely that property be assessed under uniform rules, according to the same standard of value. Those goals can be best achieved by assessors through a comprehensive assessment maintenance program and an annual review of each line item in the tax roll. See Regent Care Center, Inc., supra. However, when changes in some property tax assessments are undertaken, an assessor must provide prior written notice to the mayor, municipal governing body, county board of taxation and county tax administrator, and submit a compliance plan for approval. These provisions were included by the Legislature in Chapter 101 in order to “avoid concerns that portions of a taxing district are being singled out ...” Statement to Senate Bill No. 2711 (March 10, 2009).
Accordingly, for the foregoing reasons, the court concludes the 212 Class 4C properties affected by the increased 2014 tax year assessment constituted a “part of’ and “a portion of’ the taxing district as contemplated under N.J.S.A. 54:4-23. The court views the procedural requirements under Chapter 101 against the goals and principles of the Uniformity Clause, to ensure that all similarly-situated property in a taxing district is assessed based on a uniform standard of valuation. Thus, absent adoption of a municipal-wide revaluation or reassessment plan by a taxing district, an assessor proposing to alter multiple property assessments in a tax year, regardless of whether the proposed changes arise from an assessment maintenance practice, must give consideration to whether those properties are situate in the same neighborhood or geographical area of the taxing district, or bear the same property classification. If, after analysis, the assessor concludes the proposed changes will affect the property assessments in a neighborhood or geographical area of a taxing district, or of a substantial quantity of a particular class of property in the taxing district, then submission of a compliance plan is required.
So that municipalities, county boards of taxation and our judiciary need not continue to struggle with this issue, I urge the *438 Legislature and the Director to more clearly spell out those circumstances which give rise to the compulsory submission of a compliance plan.
2. What is a ‘reassessment’ under N.J.S.A. 54:4-23.
Plaintiff next argues the assessor’s actions do not constitute a “reassessment” of property in the taxing district. Significantly, neither plaintiff nor defendant provide the court with their interpretation of the term “reassessment”, and a review of N.J.S.A. 54:4-23 does not offer any conclusive definition. Therefore, consideration of decisional authority and legislative history is appropriate for purposes of attempting to determine the intent of the Legislature in the use of this term. See J.C. Chap. Prop. Owner’s, etc., Assoc., supra, 55 N.J. at 100, 259 A.2d 698; Township of Pennsauken v. Schad, supra, 160 N.J. at 170, 733 A.2d 1159.
The committee statements for Chapter 101 provide some guidance on the intent of the Legislature in the use of the word “reassessment.” The legislation that eventually became Chapter 101 was initially introduced in the Senate as Bill No. 1334 on May 22. 2000 (“S. 1334”). S. 1334 was passed by the Senate on October 23, 2000 and was received in the Assembly on October 30, 2000. Thereafter, S. 1334 was referred to the Assembly Local Government Committee. On November 9, 2000, similar legislation was introduced in the Assembly, as Assembly Bill No. 2947 (“A. 2947”). A 2947 was amended by the Assembly Local Government Committee to make the bill identical to S. 1334. One of the amendments to A. 2947, sought to “clarify that an assessor need not perform a reassessment of the entire municipality when he or she determines that only part of the taxing district is not in substantial compliance with the law. The assessor would still need to submit a plan to the county board of taxation ... before reassessing that part of the municipality not in substantial compliance with the law.” Assembly Local Government Committee Statement to Senate Bill No. 1334 (Jan. 18, 2001). Thus, the Legislature did not intend the term “reassessment” to encompass changes only to assessments across a municipality, instead a “reassessment” can involve changes in the assessments to those properties in the taxing district not in substantial compliance with the law.
*439 Moreover, although the term “reassessment” has become part of our daily vernacular, the only reported decision to examine the definition of the term “reassessment” is Ennis v. Township of Alexandria, 13 N.J.Tax 423 (Tax 1993). There, Judge Lasser, quoting from Section 801.13 of the Handbook for New Jersey Assessors (3d ed. 1989) described a reassessment program as:
an important change in assessment practice in a taxing district, other than a revaluation, which results in a significant difference in the aggregate assessed valuation of that taxing district from one year to a following year, other than that caused by inclusion of added assessments or other new construction, and, further, which results in a variance in values from one year to a following year in a substantial number of individual parcels of real property in that same taxing district. Like a revaluation program, a proper reassessment program seeks to spread the tax burden equitably throughout a taxing district. A reassessment program, rather than being conducted by an outside professional appraisal firm under contract with the municipality, is instead an adjustment or updating of previous revaluation or previous reassessment, carried out by, and under direct supervision of the tax assessor____It is generally accepted that a good reassessment program includes: an analysis of all recent sales of real property occurring within a taxing district, including a comparison of sales with the assessed values of the properties sold; an identification of real property value trends occurring within the taxing district; a review of all real property values, parcel by parcel within a taxing district; a review and revision of all unit land values, with such revisions as are made placed on a land value map as well as on individual property record cards; gathering of pertinent income data and utilization of such data where applicable; development of local cost conversion factors, and application of these factors to improvements contained in the taxing district, with adjustments reflected on individual property record cards; a review and adjustment of depreciation and obsolescence factors with changes reflected on individual property records; a reconciliation and revised true value developed for each property, which revised true value is to be noted on the property record card for each property; and carrying forward revised taxable values [8] to the tax list for the year in which the reassessment is to become effective.
[Id. at 426-27.]
The court also finds useful insight in the dictionary definition of the term “reassessment.” The Dictionary of Real Estate Appraisal defines reassessment as:
The relisting and revaluation of all property, or all property of a given class, within an assessment district by order of an authorized officer or body after a finding by such an officer or body that the original assessment is too faulty for correction through the usual procedures of review and equalization.
[Appraisal Institute, The Dictionary of Real Estate Appraisal 161 (5th ed. 2010).]
Therefore, the court concludes the term “reassessment”, involves a change in the property assessments of all property or *440 all property in a given class in a taxing district; or changes in property assessments to a substantial number of individual parcels in a taxing district, resulting in a variance in property values from one year to the next (except for changes to assessments permitted for added, omitted or added/omitted assessments, correction of mathematical errors, exemptions, demolitions, or changes required by tax appeal judgments). A reassessment of property is conducted and carried out by, and under the supervision of, the tax municipal tax assessor. As Judge Lasser recognized, a “good reassessment program includes: an analysis of all recent sales of real property occurring within a taxing district, including a comparison of sales with the assessed values of the properties sold; an identification of real property value trends occurring within the taxing district; a review of all real property values, parcel by parcel within a taxing district; ... gathering of pertinent income data and utilization of such data where applicable; ... a reconciliation and revised true value developed for each property ... and carrying forward revised taxable values to the tax list for the year in which the reassessment is to become effective.” Ennis, supra, 13 N.J.Tax at 426-27 (quoting Handbook for New Jersey Assessors, Section 801.13 (3d ed. 1989)). Thus, an effective and useful reassessment program “seeks to spread the tax burden equitably throughout a taxing district.” Ibid.
Analyzing the actions of the Assessor against the foregoing definition, the court concludes the Assessor conducted a reassessment of property as contemplated under N.J.S.A. 54:4-23. The Assessor admitted he did not adjust the assessments of any property in the City of Elizabeth during the 2014 tax year, other than the 212 Class 4C apartment complexes. Certification of Enrico Emma, December 10, 2014, para. 1. Unlike the circumstances presented in BASF Corp. Coating and Ink Div., supra, 22 N.J.Tax 550, where the assessor had reason to believe that a single property tax assessment was too low, here, the Assessor certified that during the 2012 and 2013 year he “began to notice that a substantial portion of the class 4e sales were selling for a price that put the ratio of true value to assessed value at below the ‘lower limit’ ratio.” Certification of Enrico Emma, dated January *441 20, 2015, para. 3. For the 2014 tax year, the Assessor instructed the “computer department” to provide him with a “print out of every 4c property in the City showing the assessment, the equalized assessment^] the number of units and the equalized assessment per unit.” Certification of Enrico Emma, dated January 20, 2015, para. 5. Thereafter, based on “income and expense data” he received in response to “Chapter 91 requests,” he performed an income capitalization approach to value each property and adjusted the property tax assessments of that class of property accordingly. Where no Chapter 91 request was made or responded to, the Assessor “established economic rent based on the age, condition and location of the property.” Certification of Enrico Emma, January 20, 2015, para. 6. The Assessor stated that he “increased the assessments of [the] 212 apartment complexes within the City of Elizabeth because ... [in his opinion] their true value was substantially below the average ratio of assessed value to true value for the City of Elizabeth.” Certification of Enrico Emma, December 10, 2014, para. 1.
In effect, the Assessor identified a class of properties in the taxing district whose original assessments he viewed as flawed and which could not be corrected through the customary equalization process. The Assessor then reviewed each assessment, parcel by parcel, based on his analysis of recent sales of similarly situated properties and the per unit value trends. The Assessor gathered pertinent income and expense data and utilized such data and information to develop a true value for each property in the subject class. Finally, the Assessor carried forward to the 2014 tax roll a revised taxable value for the properties which deviated from his value analysis. The actions of the Assessor were applied to a particular class of properties in the taxing district and affected a “substantial number of individual parcels” of properties in that class within the taxing district. Ennis, supra, 13 N.J.Tax at 427. Accordingly, the court concludes the Assessor undertook a reassessment of the Class 4C properties in the City of Elizabeth for the 2014 tax year, as contemplated under N.J.S.A. 54:4-23.
*442 3. Does assessment maintenance relieve an assessor from submitting a compliance plan prior to altering multiple property assessments?
Plaintiff argues that Chapter 101 supplemented, but did not amend the provisions of N.J.S.A. 54:4-23. Therefore, plaintiff offers that changes in assessments resulting from the practice of assessment maintenance do not require compliance with the procedural safeguards enacted under Chapter 101. Stated differently, plaintiff asks this court to read the procedural requirements enacted under Chapter 101, separately and independently from the assessor’s obligations to determine the full and fair value of each parcel of real property on the October 1 next preceding completion of his or her assessment roll under N.J.S.A. 54:4-23.
The second sentence of Chapter 101 consists of three distinct sentences, separated by two semicolons, and provides as follows:
The assessor shall ascertain the names of the owners of all real property situate in his taxing district, and after examination and inquiry, determine the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1 next preceding the date on which the assessor shall complete his assessments, as hereinafter required; ... provided further however, that when the assessor has reason to believe that property comprising all or part of a taxing district has been assessed at a value lower or higher than is consistent with the purpose of securing uniform taxable valuation of property according to law for the puipose of taxation, or that the assessment of property comprising all or part of a taxing district is not in substantial compliance with the law and that the interests of the public will be promoted by a reassessment of such property, the assessor shall, after due investigation, make a reassessment of the property in the taxing district that is not in substantial compliance, provided that (1) the assessor has first notified, in wilting, the mayor, the municipal governing body, the Division of Taxation in the Department of the Treasury, the county board of taxation, and the county tax administrator of the basis of the assessor’s determination that a reassessment of that property in the taxing district is warranted and (2) the assessor has submitted a copy of a compliance plan to the county board of taxation and to the Division of Taxation for approval ...
[N.J.S.A. 54:4-23]
As previously stated herein above, a semicolon is employed at the end of an enumeration, in separate sentences, that are related in thought. Thus, the Legislature’s use of two semicolons in the second sentence of N.J.S.A. 54:4-23 requires that the subsequent phrases be read to modify the antecedent phrases. *443 Morella v. Grand Union/New Jersey Self-Insurers Guar. Ass’n, supra, 391 N.J.Super. at 241, 917 A.2d 826. Although issues of punctuation will not be dispositive of a statute’s apparent meaning, it “is one of the means for discovering the legislative intent.” Weinacht v. Board of Chosen Freeholders, 3 N.J. 330, 333, 70 A.2d 69 (1949)(quoting from Howard Savings Institution v. City of Newark, 63 N.J.L. 547, 44 A. 654 (E & A.1899)). Punctuation is an integral part of any legislation and “may be considered in the interpretation ... but may not be used to create doubt or to distort or defeat the intention of the legislature. When the intent is uncertain, punctuation, if it affords some indication of the true intention, may be looked to as an aid.” Weinacht, supra, 3 N.J. at 334, 70 A.2d 69 (quoting Sutherland, Statutory Construction, § 4939 (3rd ed. 1943)). Here, the Legislature’s use of two semicolons in the second sentence signals that the subsequent provisions be read to modify the antecedent phrases. Thus, a strict reading of the statutory language of N.J.S.A. 54:4-23 fails to support plaintiffs theory that an assessor’s obligation to determine the full and fair value of each parcel of real property in the taxing district, should be read separately and independently from the procedural requirements under Chapter 101.
Moreover, to view the statutory provisions in the manner offered by plaintiffs counsel would render Chapter 101 redundant and meaningless, a result which must be avoided. It is well-settled that “full force and effect must be given, if possible, to every word, clause and sentence of a statute.” Hoffman v. Hock, 8 N.J. 397, 406-407, 86 A.2d 121 (quoting Oldfield v. New Jersey Realty Co., 1 N.J. 63, 68, 61 A.2d 767 (1948)). A construction by the court that renders “any part of a statute inoperative, superfluous or meaningless, is to be avoided.” Hoffman, supra, 8 N.J. at 407, 86 A.2d 121 (quoting 2 Sutherland, Statutory Construction, § 4705, p. 339 (3d ed.)).
A comprehensive assessment maintenance program may be an effective means for assessors to fulfill the directives of N.J.S.A. 54:4-23, to annually determine the full and fair value of each parcel of real property in the taxing district. However, engaging in such a practice does not relieve an assessor from fulfilling the *444 balance of the statutory obligations imposed under Chapter 101. An assessor cannot annually determine the full and fair value of each parcel of property in the taxing district and then turn a blind eye to whether some property in the taxing district is being assessed in a manner inconsistent with uniform standards of property valuation, or in a manner not in substantial compliance with the law. Such an interpretation would render the provisions of Chapter 101 meaningless and would not serve the Legislature’s intent to empower assessors with the authority to make reassessments of property in a taxing district, while avoiding policy concerns that portions of a taxing district will be singled out.
Hence, an assessor engaged in assessment maintenance, proposing to change property assessments, must give consideration to whether the proposed changes affect the same neighborhood or geographical area of a municipality, or properties bearing the same property classification. If, after analysis, the assessor concludes the contemplated changes will affect a neighborhood or geographical area of a taxing district, or a substantial number properties in the taxing district bearing the same property classification, then prior written notice to the mayor, municipal governing body, county board of taxation, county tax administrator and submission of a compliance plan is warranted. Thus, the court concludes the procedural safeguards enacted under Chapter 101 are applicable to the instant matter. As such, the Assessor’s failure to provide written notice to the mayor, municipal governing body, county board of taxation and county tax administrator, and failure to submit, and obtain approval of, a compliance plan before increasing the 2014 tax year assessments on the subject properties violated Chapter 101.
However, the Legislature did not expressly prescribe a remedy for violations of N.J.S.A. 54:4-28. Courts of equity are charged with the duty to frame equitable remedies addressing the unique characteristics and circumstances of each case. US Bank Nat. Ass’n v. Guillaume, 209 N.J. 449, 476, 38 A.3d 570 (2012). Remedies founded upon equitable principles “are distinguished for their flexibility, their unlimited variety, their adaptability to eir *445 cumstances, and the natural rules which govern their use. There is in fact no limit to their variety and application; the court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties.” Sears, Roebuck & Co. v. Camp, 124 N.J. Eq. 403, 411-12, 1 A.2d 425 (1938)(quoting John N. Pomeroy, Equity Jurisprudence § 109 (4th ed. 1918)). See Brenner v. Berkowitz, 134 N.J. 488, 514, 634 A.2d 1019 (1993)(concluding that courts retain jurisdiction to devise equitable remedies because they “allow relief to be fashioned directly to redress the statutory violations shown”). Although the Tax Court is a court of limited jurisdiction, statutorily defined, the court is charged with the responsibility to “grant legal and equitable relief so that all matters in controversy between the parties may be completely determined.” N.J.S.A. 2B:13-3. In the absence of a prescribed remedy for violations of N.J.S.A. 54:4-23, the court focuses upon the legislative goals underlying N.J.S.A. 54:4-23 in order to fashion an adequate remedy. The court is mindful that, as initially enacted, N.J.S.A. 54:4-23 sought to embody the principles of the Uniformity Clause by ensuring all real property in a taxing district was uniformly assessed. Moreover, as expressed by the Director, the objectives to be achieved by Chapter 101 are tax fairness, the treatment of similarly situated taxpayers in a consistent matter, and securing uniform taxable valuation of property according to law. 35 N.J.R. 4850(a). Consequently, if not presented with plaintiffs claims of discrimination under N.J.S.A. 54:51A-6, the remedy arising from plaintiffs violation of Chapter 101 would be entry of judgment affirming the Board judgments. However, because plaintiff has raised substantive claims of discrimination before the Tax Court under N.J.S.A. 54:51A-6, the court must weigh the merits of those claims against the relief which defendants would otherwise be entitled.
4. N.J.S.A. 54:51A-6/Chapter 123
Plaintiff correctly highlights that the Tax Court is vested with original and not appellate jurisdiction, and therefore must determine all issues of fact and law de novo. Thus, plaintiff *446 argues that it can raise and pursue before the Tax Court, for the first time, affirmative claims for relief which were not presented before the Board.
In opposition to plaintiffs position defendants raise two arguments. First, defendants argue plaintiff is precluded from raising affirmative claims of discrimination before the Tax Court, under N.J.S.A. 54:51A-6, because plaintiff failed to assert such claims for relief before the Board. The defendants’ second argument is founded upon principles of equity, and rooted in concepts of good faith and fair dealing. In essence, defendants maintain the legislative goals of N.J.S.A. 54:4-23 would be undermined and public interests would not be best served if municipal assessors would face no consequence for failing to adhere to the procedural requirements under Chapter 101.
a. De novo review
Our Supreme Court has expressed that the “Tax Court is a court of limited jurisdiction and its jurisdiction is defined by statute ... It is against this comprehensive mosaic of procedural safeguards — one with which continuing strict and unerring compliance must be observed.” McMahon v. City of Newark, 195 N.J. 526, 529, 951 A.2d 185 (2008). The court’s jurisdiction to review property tax assessments is statutorily defined under N.J.S.A. 54:3-21 and N.J.S.A. 54:51A-1. Here, jurisdiction arises under N.J.S.A. 54:51A-1, as a result of judgments entered by the Board. N.J.S.A. 54:51A-1(a) provides, in part, that:
Any party who is dissatisfied with the judgment, action or determination of the county board of taxation may seek review of that judgment, action or determination in the Tax Court by filing a complaint in the Tax Court, pursuant to rules of court.
Absent from N.J.S.A. 54:51A-1(a) is any prerequisite that all affirmative claims be presented before the county board, as a condition precedent to raising those affirmative claims for relief with the Tax Court. Moreover, this court has held that “county board hearings and Tax Court case[s] are separate and distinct proceedings, governed by different rules” and the failure to assert an affirmative claim for relief before the county board shall not serve to bar an affirmative claim for relief in the Tax Court. *447 Campbell Soup Co. v. Camden City, 16 N.J.Tax 219, 225 (Tax 1996).
In carrying out its statutory duties, the Tax Court “shall determine all issues of fact and of law de novo.” N.J.S.A. 2B:13-3(b). “By use of the term de novo the Legislature intended that this court consider an original assessment completely anew. On de novo review, the Tax Court may determine a true value different from the original assessment, the county board’s assessment, or the taxpayer’s valuation.” Campbell Soup Co., supra, 16 N.J.Tax at 225 (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 416, 495 A.2d 1308 (1985)). A de novo hearing offers the reviewing court the opportunity to consider the matter “anew, afresh [and] for a second time.” Romanowski v. Township of Brick, 185 N.J.Super. 197, 204, 447 A.2d 1352 (Law Div.1982), aff'd o.b., 192 N.J.Super. 79, 469 A.2d 85 (App.Div.1983). It is incumbent upon the reviewing court, in a de novo proceeding, to make its own findings of fact. All relevant facts must be considered, “whether or not they were previously considered ... in making the assessment.” Middlesex Water Co. v. Director, Division of Taxation, 3 N.J.Tax 233, 181 N.J.Super. 338, 437 A.2d 368 (Tax 1981). In tax appeal matters, the reviewing court is required to review an assessment and “apply the same statutory criteria that direct the assessor in the discharge of his statutory duty.” Chevron U.S.A., Inc. v. City of Perth Amboy, 9 N.J.Tax 571, 581 (Tax 1988). The decisions of the Tax Court “must be based on the evidence before it and the data that are properly at its disposal. It must also be consistent with the issues as framed by proper pleadings or settled presumptive rules reflecting the underlying policy that government action is valid.” F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 430, 495 A.2d 1313 (1985). Hence, in analyzing and dissecting the matters in controversy before the court, it is accepted that “alternative legal theories may be presented for the first time during a de novo tax appeal.” Telepages, Inc. v. Baldwin, 9 N.J.Tax 30 (Tax 1987).
Thus, the court finds no merit to defendants’ argument that plaintiffs failure to raise an affirmative claim for relief from discrimination, under N.J.S.A. 54:51A-6, before the Board pre- *448 eludes plaintiff from raising such claim for the first time before the Tax Court.
b. Square Comers Doctrine
Defendants’ second argument raises principles of equity and fair dealing. Defendants maintain that affording plaintiff with the ability to pursue claims of discrimination “will set forth a precedent that will encourage municipal tax assessor’s non-eomplianee with N.J.S.A. 54:4-23 and it is certainly not in the best interest of the public.” Stated differently, defendants’ second argument is that plaintiff should be precluded from asserting affirmative claims of discrimination because it failed to ‘turn square corners’ in its dealing with the public.
One of the central principles underlying the policy that government action is presumed valid, is the public expectation that a municipal tax assessor will act scrupulously, correctly, efficiently and honestly in complying with statutory provisions and adhering to standards of fairness when making assessments. Lowe’s Home Ctr., Inc. v. City of Millville, 25 N.J.Tax 591, 604 (Tax 2010). Our Supreme Court has demanded that “government officials act solely in the public interest. In dealing with the public, government must ‘turn square corners’ ... [i]t may not conduct itself so as to achieve or preserve any kind of bargaining or litigational advantage over the property owner. Its primary obligation is to comport itself with compunction and integrity ...” F.M.C. Stores Co., supra, 100 N.J. at 426-427, 495 A.2d 1313. It is not a prerequisite to application of the “square corners” doctrine that the municipality engage in bad faith, innocent misrepresentations by an assessor or inadvertent errors “do not relieve the government of its obligation to deal fairly, forthrightly, and scrupulous with the public.” CBS Outdoor, Inc. v. Borough of Lebanon Planning Bd., 414 N.J.Super. 563, 586, 999 A.2d 1151 (App.Div.2010); Gastime, Inc. v. Director, Division of Taxation, 20 N.J.Tax 158, 163 (Tax 2002); Lowe’s Home Ctr., Inc., supra, 25 N.J.Tax at 591. Moreover, the “[p]roper administration of our tax laws and the successful implementation of statutes [are] designed to ... demand consistency and fairness from municipal officers in their *449 dealings with property owners.” Id. at 606. Legislative goals could be undermined if a municipality was permitted to exercise its duties inconsistent with the concepts of fundamental fairness. Ibid. Taxpayers have a right to expect the municipal assessor to comply with statutory provisions and adhere to standards of fairness when making assessments. Id. at 604. A taxing district “does not stand in the same shoes as an ordinary citizen [and] the municipality and the aggrieved taxpayer are not to be analogized to private litigants competing through the judicial machinery for a tactical advantage.” F.M.C. Stores Co., supra, 100 N.J. at 426, 495 A.2d 1313. The court may exercise equitable relief under the “square corners” doctrine when the municipality falls short of the standards of fairness and fair dealings that taxpayers have the right to expect from public officials. Lowe’s Home Ctr., Inc., supra, 25 N.J.Tax at 602-603.
The “square corners” doctrine is not to be applied with “rigidity or [with] undue technicality.” Principles of equity are “always subject to the guiding principles of fundamental fairness.” New Concepts for Living, Inc. v. City of Hackensack, 376 N.J.Super. 394, 404, 870 A.2d 697 (App.Div.2005). Fundamental fairness requires a careful analysis of statutory language to unfold legislative intent and a balancing of the interests involved. As a general rule, fairness in tax matters extends not merely to the individual taxpayer, but to all taxpayers in the taxing district. Here, those principles of equity and fundamental fairness must be weighed against plaintiffs claims of discrimination, which “implicate^] the constitutional right to equal protection of the law (citations omitted), and is the subject of particular legislative concern.” F.M.C. Stores Co., supra, 100 N.J. at 428, 495 A.2d 1313.
It is well-settled that “[discrimination in the taxing system ... is not tolerated. In contrast to claims based on erroneous calculation of values, there is no good reason to tax similarly situated taxpayers at different percentages of true value.” F.M.C. Stores Co., supra, 100 N.J. at 430, 495 A.2d 1313. Generally, a claim seeking relief from discrimination under N.J.S.A. 54:51A-6, commonly referred to as Chapter 123, is available to either party *450 to a dispute seeking review of the taxable value of property. The statutory scheme is not permissive, instead Chapter 123 imposes on the court and county boards of taxation an “obligation to revise [an] assessment when [the] value ratio is outside statutory common level range.” F.M.C. Stores Co., supra at 428, 495 A.2d 1313. N.J.S.A. 54:51A-6 provides:
Whenever the tax court is satisfied by the proofs that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the trae value of the property except as hereinafter provided.
Thus, a finding that the ratio of assessed to true value exceeds the upper limit or falls below the lower limit of the common level ratio obligates the court or county board of taxation to revise assessments to conform to statutory common level range. This obligation has also been extended to cases where discrimination was not at issue if there exists “no sound reason to give a taxpayer the benefit of an erroneous valuation simply because ... the taxing district failed to cross-appeal ... [O]ur Constitution forbids preferential treatment in real property taxation.” Rabstein v. Township of Princeton, 187 N.J.Super. 18, 24, 453 A.2d 553 (App.Div.1982).
Our Supreme Court has expressed the view that a “right to relief should be determined in accordance with Chapter 123 in all but the most extreme or severe circumstances.” Murnick v. City of Asbury Park, 95 N.J. 452, 471 A.2d 1196 (1984). If a determination has been made that an assessment is discriminatory, such a finding “is the type of unfairness that requires a court to increase or decrease an assessment notwithstanding the failure of the aggrieved party to affirmatively plead for relief.” F.M.C. Stores Co., supra, 100 N.J. at 430, 495 A.2d 1313 (citing Weyerhaeuser Co. v. Borough of Closter, 190 N.J.Super. 528, 464 A.2d 1156 (App.Div.1983)). This attitude arises from the overriding view that preferential treatment in taxation is unconstitutional and will not be tolerated. One of the bedrock principles of our constitution, and system of taxation, is the ideal that all real property, in a taxing district, must be assessed under uniform rules and according to the same standard of value.
*451 The court therefore concludes the overriding policy concerns being advanced by allowing a claim of discrimination to proceed, despite the failure of a party to raise such claim for relief before the county board of taxation, outweighs the potential pitfalls that assessors will ignore the procedural requirements under Chapter 101. The court does not view the actions of the Assessor as being so egregious to warrant the potential for inequality in property taxation which may result if plaintiff was not permitted to pursue its claims of discrimination. Allegations of discrimination, if proven to be true, strike the core principles of the Uniformity Clause of our Constitution. Thus, to deny plaintiff the right to pursue affirmative claims of discrimination, would be extraordinary relief, which must be reserved for circumstances when an assessor has acted illegitimately and unreasonably and not merely resulting from a deviation of perfect practices. Shippee v. Township of Brick, 20 N.J.Tax 427, 436 (Tax 2002).
Moreover, although the court concludes the Assessor violated the procedural requirements under Chapter 101, this court does not find it necessary to apply the ‘square corners’ doctrine because plaintiff did not gain a litigational benefit. Application of turning ‘square corners’ doctrine is necessary when equity demands relief in the interests of justice. It is appropriate when the municipality achieves a benefit in the litigation process as a result of its failure to turn square corners in executing its duties. Here, plaintiff preserved no such litigational advantage. The burden of demonstrating compliance with Chapter 101 falls squarely upon the shoulders of the taxing district. When the taxing district was unable to demonstrate adherence to the compliance plan requirements, the Board correctly concluded the Assessor’s actions violated Chapter 101 and voided the increased 2014 tax year assessments on the subject properties.
The court finds defendants’ counsel’s argument that Chapter 101 is rendered meaningless if a municipal assessor will face no consequences for failing to comply with its provisions, unpersuasive. Our Legislature has carefully fashioned a procedural framework to resolve tax disputes, to which the parties must strictly adhere. F.M.C. Stores Co., supra, 100 N.J. at 429, 495 A.2d 1313. *452 Here, plaintiff bears the burden of proving the elements of discrimination, i.e., that defendants properties have not been assessed at the same standard as other taxpayers within the City of Elizabeth. The evidence required to establish a case of actionable discrimination was originally set forth in Continental Paper Co. v. Village of Ridgefield Park, 122 N.J.Super. 446, 300 A.2d 850 (App.Div.1973)(citing Reading Co. v. Township of Woodbridge, 45 N.J. 407, 426, 212 A.2d 649 (1965)), as follows:
(1) that the real property generally in the municipality was assessed at less than true value; (2) what the common level was; and, (3) the true value of the subject property upon which the common level percentage would operate.
The proofs required to be submitted under points (1) and (2) have been dispensed with by the enactment of Chapter 123. Devonshire Development Ass’n v. City of Hackensack, 2 N.J.Tax 392, 399, 184 N.J.Super. 371, 446 A.2d 201 (Tax 1981). However, evidence of true value, remains fundamental to the proofs required to support a finding of discrimination. The plaintiff must introduce evidence sufficient to demonstrate that the ratio of assessed value to true value for each of the subject properties exceeds the upper limit or falls below the lower limit of the common level range. The defendants’ argument diminishes the weighty burden imposed on plaintiff in this matter. If, at the close of the plaintiff’s proofs, the court concludes that plaintiff has failed to present evidence sufficient to determine the true value of each of the subject properties, and that the ratio of assessed value to true value for each of the subject properties exceeds the upper limit or falls below the lower limit of the common level range, the court is required to enter judgment affirming the Board judgments. Thus, the burden is imposed on plaintiff to prove not only the true value of the subject properties, but that the ratio of assessed value to true value for each of the subject properties exceeds the upper limit or falls below the lower limit of the common level range. The imposition of such an obligation is significant and does not render plaintiffs failure to comply with Chapter 101 meaningless.
5. Spot Assessment
Spot assessing is the unconstitutional and discriminatory practice of singling out for reassessment a “taxpayer or a *453 small class of taxpayers for reassessment while other taxpayers are not reassessed.” Schumar v. Borough of Bernardsville, 347 N.J.Super. 325, 330, 790 A.2d 171 (App.Div.2001). It is the “arbitrary intentional discrimination” associated with spot assessments that violates the elementary tenets of the Uniformity Clause of the New Jersey Constitution, to ensure equality of treatment and burden in property assessments. Van Decker, supra, at 362, 576 A.2d 881. Similarly, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution entitles individuals to protection from “state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class.” Id. at 362-63, 576 A.2d 881.
Although these fundamental constitutional principles must remain at the forefront of any analysis involving a change to an individual property assessment or multiple property assessments, it is unreasonable to expect assessors to “do nothing in years between district-wide revaluations or reassessments.” Regent Care Center, Inc., supra, 362 N.J.Super. at 416, 828 A.2d 332. It is customary in years when municipal-wide revaluations or reassessments have not been adopted or performed, for assessors to engage in the practice of assessment maintenance to maintain a uniform and non-discriminatory assessment roll. Id. at 411-12, 828 A.2d 332. The practice of adjusting property assessments in a legitimate and uniform manner during assessment maintenance, is an “appropriate exercise of the assessor’s statutory obligation and is not arbitrary or discriminatory.” Id. at 417, 828 A.2d 332. Assessment maintenance is therefore an essential tool afforded assessors to ensure that all parcels of real property in a taxing district are assessed under uniform rules and according to the same standard of value. It can be an “appropriate mechanism by which the assessor keeps the tax rolls current when individual properties, based upon particularized, legitimate reasons, require adjustment.” Id. at 417, 828 A.2d 332. Our Supreme Court has recognized the critical role assessment maintenance fulfills in ensuring equality of treatment and burden in property assessments. “[W]hile practicalities obviously preclude most assessors *454 reviewing every assessment line item every year, there should nevertheless be alertness to changed factors peculiarly affecting individual properties in years between revaluations and requiring prompt revision of such assessments in fairness to the particular taxpayer or to the taxing district.” Tri-Terminal Corp., supra, 68 N.J. at 414, 346 A.2d 396. Targeting a specific class of properties, which might be under-assessed is a valid reason for reassessment, so long as the assessor reviewed all properties within that class and did not select only some properties to reassess. Frieman v. Township of Randolph, 216 N.J.Super. 507, 510, 524 A.2d 453 (App.Div.1987). A finding of spot assessment is rare and “only where the reason for revising the assessments of fewer than all the properties in a district is illegal will the court roll back the assessment.” Shippe, supra.
However, if the practice of assessment maintenance results in the singling out for reassessment select properties “while leaving undisturbed the assessments of other property in the class,” that practice constitutes impermissible spot assessment and is a marked departure from the constitutional mandates of this State to ensure “equality of treatment and burden in property assessments.” Van Decker, supra, 120 N.J. at 361, 576 A.2d 881. Thus, if an assessor’s rationale for altering a property assessment is “so obviously subjective and discretionary, and not readily discernable, the tax assessor must establish additional objective proofs” to withstand a finding by the court that its practices are not unconstitutional spot assessments. Centorino v. Township of Tewksbury, 347 N.J.Super. 256, 264-65, 789 A.2d 655 (App.Div.2001). If increased assessments are based on either a sale factor or a “piecemeal review of only some properties, some classes of properties or some neighborhoods,” such actions may constitute impermissible spot assessments. Regent Care Center, Inc., supra, at 410-11, 828 A.2d 332. Conversely, if an assessor has relied upon independent, legitimate, and justifiable material to conclude that such property assessments should be increased, then the actions of the assessor should withstand scrutiny.
*455 Accordingly, in order to make a determination if unconstitutional spot assessing has taken place, the court must embark on a fact-finding mission, scrutinizing and analyzing the “situation and characterize the assessor’s actions as prohibited or appropriate”, as the facts of each case are presented. Shippee, supra, 20 N.J.Tax at 430.
Defendants’ counsel initially asserted a claim for relief alleging spot assessment, but later retracted, acknowledging the claim as premature. Here, the court cannot adequately evaluate the merits of plaintiffs assessment maintenance practice against the guiding principles and standards set forth above. Therefore, the court concludes that an insufficient record presently exists to determine if the Assessor’s actions ascend to the level of “arbitrary intentional discrimination”, or if the maintenance procedure was performed in a legitimate and uniform manner which sought to assess all parcels of real property in the taxing district under uniform rules and according to the same standard of value.
III. Conclusion
For the reasons set forth above, defendants’ motion for summary judgment seeking dismissal of those counts of plaintiffs Complaints which seek relief on the grounds that the assessments of the subject properties are “less than the true or assessable value” are granted; and defendants’ motion for summary judgment seeking dismissal of those counts of plaintiffs Complaints which seek relief on the grounds that “plaintiff is discriminated against by the assessment which is less than the true or assessable value” are denied. Plaintiffs cross-motion for partial summary judgment reversing the Union County Board of Taxation judgments is denied.

The provision requiring prior notice to the Division of Taxation in the Department of the Treasury was subsequently eliminated by the Legislature under L. 2009, c. 251.

 The provision requiring submission of the compliance plan to the Division of Taxation in the Department of the Treasury was subsequently eliminated by the Legislature under L. 2009, c. 251.

 Plaintiff did not raise affirmative claims of discrimination, under N.J.S.A. 54:51A-6, before the Union County Board of Taxation. Plaintiff raised its claims of discrimination for the first time in its Complaints to the Tax Court challenging the judgments of the Union County Board of Taxation.

 Following oral argument, defendants' counsel acknowledged that its claims of alleged violations of the Equal Protection and Due Process Clauses of the *422 United States Constitution were premature, stating in their January 23, 2015 supplemental brief to the court that "analysis of the aforesaid issues is too preliminary at this point in time as it unavoidably with [sic] entail the questioning of the tax assessor’s reasons and methods for reassessing the subject properties.”

 This provision was subsequently eliminated by the Legislature under L. 2009, c. 251.

 This provision was subsequently eliminated by the Legislature under L. 2009, c. 251.